UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL LEE AUSTIN,<br><br>        Plaintiff,<br><br>   v.<br><br>RANDY GROUNDS and DANNY HARTLINE,<br><br>        Defendants. | Case No. 09-cv-310-JPG |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion of defendants Randy Grounds and Danny Hartline for summary judgment (Doc. 40). Plaintiff Daniel Lee Austin has responded to the motion (Doc. 45).

**I.    Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases that turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969

F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.    Facts**

Viewed in the light most favorable to Austin, the relevant evidence establishes the following facts.

In 2007 and 2008, Austin was employed by the Illinois Department of Corrections ("IDOC") as the warden of the Pinckneyville Correctional Center ("Pinckneyville CC"). Hartline, IDOC's acting deputy director, was Austin's immediate supervisor. Grounds was IDOC's operations security coordinator and was Hartline's immediate supervisor. All three were supporters of the Democratic Party.

Austin's tenure with IDOC was not free from disciplinary trouble. In 2005, while he served as an assistant warden, he was disciplined for a rule violation based on his "horseplay" with a female subordinate. Austin was also investigated for his participation in a high speed chase of an escapee from another IDOC facility in May 2007. Hartline was interviewed as a

witness in the 2007 investigation, but he did not otherwise participate in the investigation. In September 2007, Hartline recommended that Austin be suspended for three days.

In late 2007, Grounds told Hartline to call the wardens in his district to solicit funds for the campaign of Democratic candidate Patty Hahn for a state legislative position. Hahn had no particular expertise in corrections issues. Pursuant to this instruction, in November or December of 2007, Hartline contacted Austin and a number of other wardens and a major under his supervision and asked for a $600 campaign contribution that would be funneled to the campaign through Grounds. Austin had told Hartline in the past to let him know if he could help the Democratic Party, so Hartline thought Austin would be receptive to the request. Although Hartline was speaking on his personal phone and had prefaced the call to Austin with the statement that this was "Dan to Dan" (suggesting Hartline was not making the call in his capacity as Austin's supervisor), Austin responded that he didn't feel comfortable with the conversation because Hartline was Austin's supervisor. Austin did not contribute to Hahn's campaign.

After Austin refused to donate to Hahn's campaign, he sensed a different atmosphere at work in that none of his work seemed to satisfy his supervisors as it had in the past. Hartline had private meetings with Austin's administrative assistant, Kelly Moeller, and Moeller then began keeping a diary of Austin's daily activities. On behalf of Grounds, Hartline directed Austin to change Moeller's evaluation to be more favorable.

In early 2008, an IDOC official received an anonymous letter critical of Austin's management of Pinckneyville CC, including favoritism towards Austin's wife, who was also employed at the prison, and about other activities that occurred there. In response, IDOC employee Ricky Harrington investigated Austin. After a less than thorough investigation,

Harrington found that Austin had falsified two timesheets in January 2008 and had harassed Moeller and his secretary, Dessie Staley, in violation of IDOC rules. The complaint of harassment normally would have been referred to IDOC's Affirmative Action Department but was not in this instance.

Neither Hartline nor Grounds initiated or conducted the investigation, but based on the investigation's results, on April 17, 2008, Hartline recommended Austin be suspended for seven days. Since Austin had not yet served the three-day suspension Hartline recommended in response to the 2007 investigation, Hartline recommended the suspensions be consolidated as a single ten-day suspension. In addition, based on the 2005 and 2007 disciplinary actions and two other instances where Hartline believed Austin had exercised poor judgment (by failing to timely inform an inmate's family after the inmate's death and by calling on the National Guard to fix a backed up sewer that was able to be fixed locally by available engineers), Hartline recommended Austin be demoted to the rank of major and transferred to a different IDOC facility. Grounds understood Hartline's recommendation to rest on Harrington's findings as well as Austin's prior disciplinary history and his two instances of poor judgment. He therefore concurred with Hartline's recommendation.

On April 25, 2008, IDOC's Director Roger Walker terminated Austin from his employment. Neither Hartline nor Grounds had recommended that Austin be terminated, and Hartline had given Austin excellent performance reviews in the past, one as recently as March 2008.

Austin believes either his filing of a workers' compensation claim or his failure to make a contribution to Hahn's campaign was the real reason for his termination. He filed this lawsuit alleging in a claim under 42 U.S.C. § 1983 that he was terminated in violation of his First

Amendment rights because he failed to donate to Hahn's campaign. He also alleges a claim under 42 U.S.C. § 1981.

Grounds and Hartline ask the Court to grant summary judgment in their favor on Austin's § 1981 claim on the basis that no racial discrimination is alleged in this suit and on Austin's § 1983 claim on the basis of qualified immunity. Austin does not contest that summary judgment should be granted on his § 1981 claim, but argues that the law clearly established at the time that Hartline's and Grounds' conduct was unconstitutional and that there is a genuine issue of material fact precluding summary judgment.

### III.     Analysis

#### A.     42 U.S.C. § 1981

Section 1981 is "a broad-based prohibition (and federal remedy) against racial discrimination in the making and enforcing of contracts." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 393 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). It provides, in pertinent part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The statute further defines making and enforcing contracts to mean "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

No evidence even hints that any of the defendants' actions were the product of racial discrimination. Accordingly, the defendants are entitled to summary judgment on this claim.

#### B.     42 U.S.C. § 1983

The First Amendment to the United States Constitution provides "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble.

. . ." U.S. Const. amend. 1. The Process Clause of the Fourteenth Amendment makes First Amendment free speech and assembly guarantees applicable to states as well as the federal government. *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003).

One component of the First Amendment is the prohibition on retaliation against a public employee for speaking – or in this case, for not "speaking" by making a political contribution – on a matter of public concern unless the needs of the government outweigh the speech rights of the employee. *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968); *see City of San Diego v. Roe*, 543 U.S. 77, 82-83 (2004). To prevail on a First Amendment retaliation claim, plaintiffs must show that "(1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech caused the employer's action." *Gunville v. Walker*, 583 F.3d 979, 983 (7th Cir. 2009); *see Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The third element in the plaintiff's *prima facie* case – causation – applies a "but-for" causation standard. *Gunville*, 583 F.3d at 984 n. 1 (citing *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009)).

A defendant may avoid liability for retaliation in violation of the First Amendment if he is protected by qualified immunity, an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 129 S. Ct. at 815-16; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). While it is often beneficial to first inquire into whether the plaintiff has shown a constitutional violation, the Court has discretion to address the second prong first in light of the circumstances of the case. *Pearson*, 129 S. Ct. at 818.

   1. <u>Clearly Established Law</u>

The defendants argue that, at the time of Austin's termination, it was not clear that it was unconstitutional to fire a policy-making employee like a warden for failing to make a political contribution. Thus, even if they had been responsible for Austin's termination, which they deny, it was not clearly established that their conduct was unconstitutional.

At the time of the events in this case, the law was clear that, with limited exceptions, a public employer could not dismiss employees because they were not members of or sponsored by a political party. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion); *id.* at 375 (Stewart, J., and Blackmun, J., concurring); *Branti v. Finkel*, 445 U.S. 507, 517 (1980). In *Elrod*, a Supreme Court plurality held that conditioning public employment on support of a particular political party inhibited employees' exercise of their First Amendment right of association. *Id.* at 359. Infringement on that fundamental right was justified only where the political patronage practices were narrowly tailored to further a vital governmental interest. *Id.* at 362-63. For example, the Court acknowledged the danger that governmental policy implementation might be threatened by obstructionist tactics of political opponents in policymaking positions and, accordingly, carved out an exception to the prohibition on

7

patronage dismissals for policymaking positions. *Id.* at 367. The *Branti* Court more clearly defined this exception: patronage dismissals are constitutional only where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. In *Rutan v. Republican Party of Ill.,* 497 U.S. 62 (1990), the Supreme Court confirmed that *Elrod* and *Branti*'s prohibition on patronage dismissals also applies to patronage promotions, transfers and rehires in the absence of a vital governmental interest. *Rutan*, 497 U.S. at 74-75.

It was also clear by 2008 that it was a violation of the First Amendment to condition a public employee's employment on making a financial contribution to a political cause. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977). *Abood* involved the use of mandatory teachers' union service fees to support ideological causes that the contributing teachers may oppose. *Id.* at 211. Referring to the principle that no official can prescribe the politics of citizens, the Court stated:

> These principles prohibit a State from compelling any individual to affirm his belief in God, *Torcaso v. Watkins*, [367 U.S. 488 (1961)], or to associate with a political party, *Elrod v. Burns,* [427 U.S. 347 (1976)], as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher.

*Abood*, 431 U.S. at 235. *Abood* clearly established that it was unconstitutional to force a public employee, albeit not a policy-making employee, to make a political contribution as a condition of his employment. *Id.* at 234-35.

In light of *Elrod, Branti,* and *Rutan,* the law was clear in 2008 that dismissal from public policy-making employment could be grounded on the lack of a shared ideology about how to implement policies in operating the state's correctional facilities. *See Pierson v. Blagojevich*,

437 F.3d 587, 588 (7th Cir. 2005) (*per curiam*) (IDOC warden is policy-maker) (citing *Riley v. Blagojevich*, 425 F.3d 357, 363-64 (7th Cir. 2005) (IDOC assistant warden is policy-maker). Shared ideology among policy-makers is an employment requirement narrowly tailored to further the vital governmental interest of implementing policy, and, as the defendants rightly point out, if Austin had not been a Democrat, he could have been subject to dismissal based on that fact. However, that is not the situation presented by this case, which focuses on financial contributions rather than shared ideology.

It was also clear in 2008, in light of *Abood*, that dismissal from public employment could not be grounded on an employee's financial support of a political party or candidate. *Elrod, Branti* and *Rutan* suggest that there may be an exception to this rule where requiring financial support is a measure narrowly tailored to further a vital governmental interest, *see Elrod*, 427 U.S. at 362-63, that is, where the hiring authority can demonstrate that the donation was "an appropriate requirement for the effective performance of the public office involved," *Branti*, 445 U.S. at 518. However, there is no basis for a reasonable official in the defendants' situation to believe that a warden's $600 financial contribution to a political campaign of a candidate with no corrections expertise is necessary for the effective performance of the warden's job. In fact, the Court cannot conceive of any situation in which requiring such a donation is the least restrictive means of furthering any legitimate governmental interest. Thus, it should have been apparent to Hartline and Grounds that terminating a warden for failure to donate to Hahn's political campaign was unconstitutional.

It is true that Austin has not identified a factually indistinguishable case clearly establishing that a warden may not be fired for failing to make a political donation. However, a factually indistinguishable case is not necessary where the broad principles are clearly

9

established, and the reasonable application of those broad principles to the facts can only yield one result. Where unlawfulness is apparent in light of the pre-existing law, there is no need for a factually similar case. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The right not to be fired for failing to make a political donation unnecessary to his job was indeed "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Nothing more is required.

For these reasons, if Austin was, in fact, terminated because he failed to contribute to Hahn's campaign, the defendants are not entitled to qualified immunity.

2. Violation of a Constitutional Right

As noted above, to establish a claim of retaliation for the exercise of First Amendment rights, a plaintiff must show constitutionally protected speech, a deprivation likely to deter speech and causation. *Gunville v. Walker*, 583 F.3d 979, 983-84 (7th Cir. 2009). The defendants argue Austin cannot prove the first and third elements.

As for the first element, the defendants argue Austin's "speech," – his failure to donate to Hahn's campaign – was not protected because his political affiliation was a permissible basis for termination under *Rutan v. Republican Party of Ill.,* 497 U.S. 62 (1990). However, as discussed above, Austin does not allege his was terminated based on his political affiliation or ideology but for his failure to make a political contribution, an improper basis for terminating even a policy-making employee. Thus, Austin may be able to establish his speech was constitutionally protected.

Austin stumbles, however, on the causation element. In order to prove causation, it is essential to show that the person making the decision to take adverse action against the plaintiff knew of the plaintiff's protected activity. *See Gunville*, 583 F.3d at 984 ("In order to

demonstrate that the defendants were motivated by political affiliation in determining which employees to terminate, the plaintiffs must first show that the defendants knew of their association with the Republican party."). If the decision-maker did not know of the plaintiff's protected activity, he cannot possibly have based his decision on that activity. *See Nelms v. Modisett*, 153 F.3d 815, 810 (7th Cir. 1998).

Here, there is evidence that Grounds and Hartline knew of Austin's failure to contribute to Hahn's campaign, but there is no evidence Walker, the person who decided to fire Austin, was privy to that information. Thus, a reasonable jury could not find that Walker relied on Austin's failure to contribute in deciding to terminate his employment.

To the extent Austin may be arguing that Grounds and Hartline orchestrated the events that set the stage for Austin's termination such that they could be viewed as the real decision-makers, there is no evidence to support that theory. No facts suggest that Austin's disciplinary history prior to the fall of 2007 was the result of or motivated by any of his political beliefs or activities. Furthermore, no evidence suggests that following Austin's failure to donate to Hahn's campaign, Grounds or Hartline was tied at all to the investigation that precipitated Austin's termination. There is no evidence they were responsible for the anonymous letter, that they initiated the investigation, that they caused Harrington's inquiries to be irregular or incomplete, or that they even knew the investigation was flawed.

In response to Harrington's report, which found Austin had falsified records and harassed employees, Hartline recommended a seven-day suspension to be served along with a three-day suspension imposed months prior to Austin's failure to donate. Hartline has also offered legitimate reasons for recommending a demotion and transfer, including Austin's disciplinary history and two instances of not insignificant "poor judgment," and Austin has pointed to

nothing to call the genuineness of those reasons into question other than timing, that is, that his termination followed his refusal to donate. However, in order to create an inference of causation, timing must be extremely suspicious. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007); *see Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval cannot create causal connection). The gap of several months between the donation request and the defendants' disciplinary recommendation is not sufficiently short to create an inference of causation. Furthermore, the recommendation for demotion and a transfer does not seem on its face to be an overreaction to the concerns Hartline says motivated it. Similarly, no evidence suggests Grounds concurred with Hartline's recommendation because of Austin's failure to donate.

Most importantly, the recommendation of Hartline and Grounds did not request termination. A reasonable jury simply could not find that Hartline and Grounds' recommendation for a suspension, demotion and transfer was caused by Austin's failure to donate to the Hahn campaign or that the recommendation for lesser discipline played a significant role in causing Walker to terminate Austin as opposed to imposing a lesser discipline.[1]

For these reasons, Hartline and Grounds are entitled to summary judgment on Austin's § 1983 claim.

---

[1]The Court is familiar with political practices in Illinois of both major political parties, and it is not a "babe in the woods." It is by no means suggesting it is inconceivable that Austin was fired for failing to make a political donation, but it is finding there is not enough evidence to take this case to a jury. "[S]ummary judgment is the 'put up or shut up' moment in the life of a case," *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008), and Austin has simply failed to uncover and put up evidence to prove his case.

**VI.     Conclusion**

For the foregoing reasons, the Court **GRANTS** the defendants' motion for summary judgment (Doc. 40) on all claims in this case and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  February 7, 2011**

                                                                  s/ J. Phil Gilbert          
                                                                  **J. PHIL GILBERT**
                                                                  **DISTRICT JUDGE**